# Exhibit B



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 2, 2016

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
777 Sixth Street NW, 11th Floor
Washington, DC 20001-3706

Re:     **Bank Julius Baer & Co. Ltd. – Deferred Prosecution Agreement**

Dear Messrs. Morillo and Joksimovic:

Pursuant to our discussions and written exchanges, the Office of the United States Attorney for the Southern District of New York (the "Office") and defendant Bank Julius Baer & Co. Ltd. ("Julius Baer" or the "Bank"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement"). The Agreement has been approved by the Tax Division of the United States Department of Justice (the "Tax Division").

This Agreement shall take effect upon its execution by both parties.

### The Criminal Information

1.      Julius Baer consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging Julius Baer with conspiring with others, including U.S. taxpayers, in violation of Title 18, United States Code, Section 371, to (1) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service (the "IRS"), (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1), and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201. A copy of the Information is attached hereto as Exhibit B.

### Acceptance of Responsibility

2.      Julius Baer admits and stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate. In sum, Julius Baer admits that it knowingly and willfully agreed to assist, and did assist, certain of its U.S. taxpayer-clients to hide overseas bank accounts from the IRS and to evade these clients' tax and reporting obligations under U.S. law.

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 2

      3.   Julius Baer further admits and stipulates that the acts labeled "overt acts" and set forth in Paragraph 11 of the Information in fact took place.

## Restitution, Forfeiture and Penalty Obligations

      4.     As a result of the conduct described in the Information and the Statement of Facts, Julius Baer agrees to make payments in total of $547.25 million to the United States. Specifically, Julius Baer agrees to (1) make a payment of restitution in the amount of $247 million (the "Tax Restitution Amount"), (2) forfeit to the United States $219.25 million (the "Forfeiture Amount"), and (3) pay a penalty of $81 million (the "Penalty Amount") to the U.S. Department of Justice (the "Department"), as set forth below.

      5.     In regard to the Tax Restitution Amount, Julius Baer admits that the Tax Restitution Amount represents the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts. The Tax Restitution Amount shall not be further reduced by payments that have been made or may be made to the United States by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs (collectively, "OVDI") before or after the date of this Agreement. Julius Baer agrees to pay the Tax Restitution Amount to the IRS by wire transfer within seven (7) days of the date of the execution of this Agreement. If Julius Baer fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 19 and 20, below.

      6.     In regard to the Forfeiture Amount, Julius Baer agrees, pursuant to Title 18, United States Code, Section 981(a)(1)(C) that it will forfeit to the United States the Forfeiture Amount.

      7.     The Forfeiture Amount of $219.25 million represents gross fees paid to Julius Baer by U.S. taxpayers with undeclared accounts at Julius Baer from January 1, 2001 through approximately December 31, 2011.

      8.     The Forfeiture Amount shall be sent by wire transfer to a seized asset deposit account maintained by the United States Department of the Treasury within seven (7) days of the execution of this Agreement. If Julius Baer fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 19 and 20, below.

      9.     Julius Baer agrees this Agreement, the Information, and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Exhibit D, that will be filed against the Forfeiture Amount. By this Agreement, Julius Baer expressly waives service of that Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 3

Forfeiture Amount.  Julius Baer also agrees that the facts contained in the Information and Statement of Facts are sufficient to establish that the Forfeiture Amount is subject to civil forfeiture to the United States.

10.    The Office and Julius Baer agree that, consistent with the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572(a), and in light of the Forfeiture Amount and the Tax Restitution Amount, the Penalty Amount of $81 million is an appropriate penalty in this case.  Julius Baer agrees to pay the Penalty Amount as directed by the Office within seven (7) business days of the date of the execution of this Agreement.  The Penalty Amount represents a reduction of approximately 85% from the low end of the fine range that the parties agree would be applicable under the United States Sentencing Guidelines if Julius Baer had been convicted and sentenced for its criminal conduct.  The Office and Julius Baer agree that the Penalty Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of Julius Baer's conduct as set forth in the  Statement of Facts, and also, in mitigation of a higher penalty, among other things: (1) Julius Baer's blocked efforts to self-report to U.S. authorities as set forth in the Statement of Facts, and (2) Julius Baer's thorough internal investigation and concomitant efforts to provide extensive information and materials derived from that investigation to U.S. authorities.  The Penalty Amount is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Office that the Penalty Amount is the maximum penalty that may be imposed in any future prosecution, and the Office is not precluded from arguing in any future prosecution that the Court should impose a higher penalty.

11.    Upon payment of the Forfeiture Amount, Julius Baer shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds.  Julius Baer agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount or the payment of the Penalty Amount and will not assist a third party in asserting any claim to the Forfeiture Amount or the Penalty Amount.

12.    Julius Baer agrees that the Tax Restitution Amount, the Forfeiture Amount and the Penalty Amount shall be treated as non-tax-deductible amounts paid to the United States government for all tax purposes under United States law.   Julius Baer agrees that it will not claim, assert, or apply for, either directly or indirectly, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $547.25 million that Julius Baer has agreed to pay to the United States pursuant to this Agreement.

## Obligations to Cooperate

13.    Julius Baer agrees to cooperate fully with the Department and the IRS, and any other governmental agency designated by the Office regarding any matter relating to the Department's investigation about which Julius Baer has information or knowledge.

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 4

14.     It is understood that Julius Baer shall (a) truthfully and completely disclose all information with respect to the activities of Julius Baer, its officers and employees, and others concerning all such matters about which this Office inquires related to this Office's investigation, which information can be used for any purpose, except as limited by this Agreement or by applicable law; (b) cooperate fully with the Department, the IRS, and any other law enforcement agency so designated by this Office, except as limited by applicable law; (c) consent to the production to the Department of any document, record, or other tangible evidence, except as limited by applicable law; (d) specifically provide, upon request, all items, assistance, information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Program") as set forth specifically in Parts II.D.1,2 and 4 and Part II.F of the Program; (e) undertake the retention of records as set forth in Parts II.D.5 and II.E of the Program; (f) implement the closure of recalcitrant accounts and related procedures, to the extent that it has not already done so, as set forth in Part II.G of the Program; (g) shall, at the Department's request, use its best efforts to secure the attendance and truthful statements or testimony of any officer, agent, employee, or former officer, agent or employee, at any meeting or interview or before the grand jury or at any trial or other court proceeding, to the extent permitted by applicable law; and (h) shall commit no crimes whatsoever. It is further understood that Julius Baer will bring to this Office's attention (a) all criminal conduct by, and criminal investigations of, Julius Baer or its employees related to any violations of the federal laws of the United States that come to the attention of Julius Baer, and (b) any administrative or regulatory proceeding or civil action brought or investigation conducted by any U.S. governmental authority that alleges fraud by Julius Baer or any other violations of the federal laws of the United States in the operation or management of Julius Baer's business.

## Deferral of Prosecution and Duration of the Agreement

15.     The actions Julius Baer has taken to date demonstrate acceptance and acknowledgment of responsibility for its conduct, including, among other things:

- Making a Board-level decision in 2009 to self-report its conduct to the Department;

- Implementing remedial measures before it became aware it was the subject of a U.S. law enforcement investigation;

- Conducting a thorough internal investigation and providing the Office with the facts, including unfavorable ones, discovered during the course of that internal investigation;

- Advocating in favor of a decision provided by the Swiss Federal Council in April 2012 to allow banks under investigation by the Department to legally produce employee and third-party information to the Department and subsequently

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 5

      producing such information almost immediately upon issuance of that decision; and

- Encouraging and facilitating certain employees, including specifically charged defendants Fabio Frazzetto and Daniela Casadei, to accept responsibility for their participation in the conduct set forth in the Statement of Facts and to cooperate with the investigation being conducted by the Department and the IRS.

Julius Baer has also made a commitment to: (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information; (b) cooperate with the Department and the IRS; (c) make the payment specified in this Agreement; (d) comply with the federal criminal laws of the United States (as provided herein in Paragraph 14); and (e) otherwise comply with all of the terms of this Agreement. In consideration of the foregoing, the Office shall recommend to the Court that prosecution of Julius Baer on the Information be deferred for three years from the date of the signing of this Agreement. Julius Baer shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

      16.    Julius Baer agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the Court's acceptance of this Agreement, unless otherwise extended pursuant to Paragraph 18 below (the "Deferral Period"). Julius Baer's obligation to cooperate is not intended to apply in the event that a prosecution against Julius Baer by this Office is pursued and not deferred.

      17.    The Office agrees that if Julius Baer is in compliance with all of its obligations under this Agreement, the Office will, at the expiration of the Deferral Period (including any extensions thereof), seek dismissal with prejudice of the Information filed against Julius Baer pursuant to this Agreement. Except in the event of a violation by Julius Baer of any term of this Agreement or as otherwise provided in Paragraph 19, the Office will bring no additional charges or other civil action against Julius Baer relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than Julius Baer and its affiliated entities. Julius Baer and the Office understand that the Agreement to defer prosecution of Julius Baer must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason: (a) both the Office and Julius Baer are released from any obligation imposed upon them by this Agreement; (b) this Agreement shall be null and void, except for the tolling provision set forth in Paragraph 19, below; and (c) if they have already been transferred to the United States, the Tax Restitution Amount, Forfeiture Amount and Penalty Amount shall be returned to Julius Baer.

      18.    Julius Baer agrees that, in the event that the Office determines during the Deferral Period described in paragraph 16 above (or any extensions thereof) that Julius Baer has

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 6

violated any provision of this Agreement, an extension of the period of the Deferral Period may be imposed in the sole discretion of the Office, up to an additional year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years.

## Additional Provisions

19.     It is understood that should the Office in its sole discretion determine that Julius Baer: (a) has knowingly given false, incomplete or misleading information either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information or Statement of Facts; (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement; or (c) otherwise violated any provision of this Agreement, Julius Baer shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, of which the Office has knowledge, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice.   Any such prosecution or civil action may be premised on any information provided by or on behalf of Julius Baer to the Department or the IRS at any time.   In any prosecution or civil action based on the Information, the Statement of Facts, or the conduct described therein, it is understood that: (a) no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Office and Julius Baer), and excluding the period from the execution of this Agreement until its termination; and (b) Julius Baer agrees to toll, and exclude from any calculation of time, the running of the statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to Paragraph 18 above.   By this Agreement, Julius Baer expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay.   Such waivers are knowing, voluntary, and in express reliance on the advice of Julius Baer's counsel.

20.     It is further agreed that in the event that the Office, in its sole discretion, determines that Julius Baer has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of Julius Baer to the Office, the Department, or the IRS, including but not limited to the Statement of Facts, or any testimony given by Julius Baer or by any agent of Julius Baer before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against Julius Baer; and (b) Julius Baer shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of Julius Baer before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence.   It is the intent of this Agreement to waive any and all rights in the foregoing respects.

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 7

21.    Julius Baer, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement.   Consistent with this provision, Julius Baer may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not contradict the Statement of Facts or such representations.  Any such contradictory statement by Julius Baer, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and Julius Baer thereafter shall be subject to prosecution as specified in paragraphs 19 and 20, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 18, above.   The decision as to whether any such contradictory statement will be imputed to Julius Baer for the purpose of determining whether Julius Baer has violated this Agreement shall be within the sole discretion of the Office.  Upon the Office's notifying Julius Baer of any such contradictory statement, Julius Baer may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within forty-eight (48) hours after having been provided notice by the Office.  Julius Baer consents to the public release by the Office, in its sole discretion, of any such repudiation. Nothing in this Agreement is meant to affect the obligation of Julius Baer or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

22.    Julius Baer agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 19 and 20 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 18.  Julius Baer understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court.  Should the Office determine that Julius Baer has violated this Agreement, the Office shall provide notice to Julius Baer of that determination and provide Julius Baer with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by Julius Baer.

## Limits of the Agreement

23.    It is understood that this Agreement is binding on the Office and the Tax Division but does not bind any other components of the Department, any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by Julius Baer or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of Julius Baer, and Julius Baer's compliance with its obligations under this Agreement.

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 8

### Public Filing

24.    The Office and Julius Baer agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

25.    The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

### Execution in Counterparts

26.    This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

### Integration Clause

27.    This Agreement sets forth all the terms of the Deferred Prosecution Agreement between Julius Baer and the Office.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, Julius Baer's attorneys, and a duly authorized representative of Julius Baer.

Dated: New York, New York
        February 2, 2016

Very truly yours,

PREET BHARARA
United States Attorney

By: _____
Jason H. Cowley
Sarah E. Paul
Assistant United States Attorneys
(212) 637-2200

APPROVED:

_____
Daniel L. Stein
Chief, Criminal Division

Juan P. Morillo, Esq.
Tomislav A. Joksimovic, Esq.
Page 9


Accepted and agreed to:

_____
CHRISTOPH HIESTAND
General Counsel, Julius Baer Group Ltd.

2/2/2016
Date

_____
JUAN P. MORILLO
Attorney for Bank Julius Baer & Co. Ltd.

2/2/2016
Date

# Exhibit A
# to the Deferred
# Prosecution Agreement

Exhibit A to Deferred Prosecution Agreement

**Resolution of the Board of Directors of Bank Julius Baer & Co. Ltd., 29 January 2016**

At a duly held meeting held on 29 January 2016, the Board of Directors (the "Board") of Bank Julius Baer & Co. Ltd. (the "Company") unanimously resolved as follows:

**WHEREAS**, the Company has been engaged in discussions with the United States Attorney's Office for the Southern District of New York (the "Office") in connection with an investigation being conducted by the Office regarding tax-related offenses in the operation of the Company's U.S. cross-border business (the "Investigation");

**WHEREAS**, the Board has determined that it is in the best interest of the Company to enter into a deferred prosecution agreement with the Office that would resolve the investigation on the terms that have been presented by and discussed with the Office, and approved by the Department of Justice, Tax Division (the "Agreement"); and

**WHEREAS**, the Group General Counsel and the Company's U.S. counsel (identified below) have advised the Board of the Company's rights, possible defenses, and the consequences of entering into the Agreement;

This Board hereby **RESOLVES** that:

1. Juan P. Morillo, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP, is U.S. counsel to the Company in connection with the Investigation.  Mr. Morillo is authorized to take, on behalf of the Company, any and all actions as may be necessary or appropriate, and to approve and execute the forms, terms or provisions of any agreement or other document, as may be necessary or appropriate to carry out and effectuate the purpose and intent of the resolutions herein, including specifically entering an appearance on behalf of the Company and representing the Company in any proceeding relating to the Investigation;

2. The Company (i) consents to the filing in the United States District Court for the Southern District of New York (the "Court") of an Information charging the Company with one count of participating in a conspiracy in violation of 18 U.S.C. § 371 to, among other things, defraud the United States and its agency, the Internal Revenue Service, in connection with the conduct of its U.S. cross-border business

BANK JULIUS BAER & CO. LTD.

as set forth more fully in the Information attached as Exhibit B to the Agreement and reviewed by this Board; and (ii) agrees to pay an amount no greater than USD 547.25 million in connection with the execution of the Agreement and to execute the ongoing obligations described therein in accordance with Swiss law;

3. Each member of the Board of the Company has (i) reviewed the Agreement, including the Information attached as Exhibit B to the Agreement, the Statement of Facts attached as Exhibit C to the Agreement, and the Civil Forfeiture Complaint attached as Exhibit D to the Agreement; (ii) consulted with the Group General Counsel and the Company's U.S. counsel in connection with this matter; and (iii) voted to enter into the Agreement;

4. Each member of the Board of the Company understands and agrees to the terms of the Agreement and acknowledges the accuracy of the Statement of Facts, attached as Exhibit C to the Agreement;

5. Any of the Chief Executive Officer of the Company, Boris F. J. Collardi, and the Group General Counsel, Christoph Hiestand, by sole signature (the "Authorized Signatories") are hereby authorized on behalf of the Company to execute the Agreement substantially in such form as reviewed by this Board with such non-material changes as the Authorized Signatories may approve and to respond to questions posed by the judge in any proceeding in this matter;

6. All of the actions of the Authorized Signatories, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company;

7. Each member of the Board agrees that the Company is fully satisfied with its attorneys' representation during all phases of the Investigation and the resolution of this matter;

8. Each member of the Board agrees that the Company's entry into the Agreement and the entry of this Resolution are voluntary and did not result from force, threats, or promises (other than promises in the Agreement);

9. The Chairman and the Company Secretary signing below confirm (i) the Board's unanimous approval of the Agreement and this Resolution; and (ii) that, based on this Resolution, the Authorized Signatories, according to Section 5 above, each have the authority to individually execute the Agreement and accordingly bind the Company under Swiss law and pursuant to the Company's by-laws and any other documents relevant to its governance.

**IN WITNESS WHEREOF, the Board of Directors of the Company has executed this Resolution.**

Zurich, 29 January 2016

Chairman:

Daniel J. Sauter

Secretary:

Roberto Küttel

## Official Certification

Seen for authentication of the foregoing signatures, affixed in our presence by

Mr. **Daniel Joseph SAUTER**, Swiss citizen of Zürich ZH, in Zug, Switzerland, personally known to us,

Mr. **Roberto Giuseppe KÜTTEL**, Swiss citizen of Rüschlikon/ZH, in Wollerau, Switzerland, personally known to us,

who are entered in the Register of Commerce of the Kanton of Zürich as president of the board of directors with the right to sign jointly by two resp. as person with the right to sign jointly by two limited to the head office for the

**Bank Julius Baer & Co. Ltd.**, corporation with registered head office in Zürich.

The inspection of the commercial register has taken place directly before the official certification by internet inquiry.

Zürich, 29th January 2016
BK no. 20622-27/ems
Fee CHF 60.00

**NOTARIAT ZÜRICH (ALTSTADT)**

F. Killer, Notariatssekretärin mbA mit Beglaubigungsbefugnis



## APOSTILLE
(Convention de la Haye du 5 octobre 1961)

1. Land: Schweizerische Eidgenossenschaft, Kanton Zürich
   Country: Swiss Confederation, Canton of Zürich
   Diese öffentliche Urkunde / This public document

2. ist unterschrieben von
   has been signed by                    Franziska Killer

3. in seiner Eigenschaft als
   acting in the capacity of             Notariatssekretär/in

4. sie ist versehen mit dem Stempel/Siegel des (der) — bears the stamp/seal of
   Notariat Zürich (Altstadt) Kt. Zürich

   |  | Bestätigt / Certified |
   |---|---|
   | 5. In / at 8090 Zürich / Zurich | 6. am / the   29.01.2016 |

7. durch die Staatskanzlei des Kantons Zürich
   by Chancery of State of the Canton of Zurich

8. unter Nr. / under N°     1036998/2016

9. Stempel/Siegel, Stamp/seal     10. Unterschrift / Signature

S. Overkott

# Exhibit B
# to the Deferred
# Prosecution Agreement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                  :
   UNITED STATES OF AMERICA        :        INFORMATION
          - v. -                   :
   BANK JULIUS BAER & CO. LTD.,    :        S3 11 Cr. 866 (LTS)
                                  :
          Defendant.              :
- - - - - - - - - - - - - - - - - x

## COUNT ONE
(Conspiracy)

The United States Attorney charges:

### Bank Julius Baer & Co. Ltd.

1.    At all times relevant to this Information, BANK
JULIUS BAER & CO. LTD. ("BJB"), the defendant, provided private
banking, asset management, and other services to individuals and
entities around the world, including U.S. taxpayers in the Southern
District of New York.  Until in or about 2005, BJB maintained an
office in the Southern District of New York.

### Obligations of U.S. Taxpayers
### With Respect to Foreign Financial Accounts

2.    At all times relevant to this Information, citizens
and residents of the United States who had income in any one calendar
year in excess of a threshold amount ("U.S. taxpayers") were required
to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"),

for that calendar year with the Internal Revenue Service ("IRS").
On Form 1040, U.S. taxpayers were obligated to report their worldwide
income, including income earned in foreign bank accounts.   In
addition, when a U.S. taxpayer completed Schedule B of Form 1040,
he or she was required to indicate whether "at any time during [the
relevant calendar year]" the filer had "an interest in or a signature
or other authority over a financial account in a foreign country,
such as a bank account, securities account, or other financial
account," and if so, the U.S. taxpayer was required to name the
country.

        3.    In addition, U.S. taxpayers who had a financial
interest in, or signature or other authority over, a foreign bank
account with an aggregate value of more than $10,000 at any time
during a particular calendar year were required to file with the IRS
a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1
("FBAR") on or before June 30 of the following year.   In general,
the FBAR required that the U.S. taxpayer filing the form identify
the financial institution with which the financial account was held,
the type of account (either bank, securities, or other), the account
number, and the maximum value of the account during the calendar year
for which the FBAR was being filed.

        4.    The regulations relating to the required disclosure
of foreign bank accounts specifically preclude U.S. taxpayers from

having foreign accounts nominally held by sham corporate structures

as a means of avoiding disclosure.  Specifically, as set forth in

Title 31, Code of Federal Regulations, Section 1010.350(e)(3):

> A United States person that causes an entity, including
> but not limited to a corporation, partnership, or trust,
> to be created for a purpose of evading this section
> [requiring generally the disclosure of offshore financial
> accounts containing over $10,000 and over which a U.S.
> taxpayer has signature or other authority] shall have a
> financial interest in any bank, securities, or other
> financial account in a foreign country for which the entity
> is the owner of record or holder of legal title.

### Overview of the Conspiracy

5.    From at least in or about 2001 up through and

including in or about 2009, numerous U.S. taxpayer-clients conspired

with BJB, the defendant, and others known and unknown, to defraud

the United States, to conceal from the IRS the existence of bank

accounts maintained at BJB and the income earned in these accounts

(hereafter "the undeclared accounts"), and to evade U.S. taxes on

income generated in the undeclared accounts.  At its peak in or

around 2007, BJB conspired with U.S. taxpayer-clients to hide at

least $4.7 billion in assets from the IRS in accounts at BJB.  In

furtherance of the conspiracy, client advisors at BJB, among other

things, advised and helped U.S. taxpayer-clients open and maintain

undeclared accounts in code names or in the names of non-U.S.

relatives or sham corporate entities; ensured that mail relating to

those accounts was not sent to U.S. taxpayer-clients in the United

States; caused U.S. taxpayer-clients to travel to Switzerland to conduct business relating to the undeclared accounts; traveled to the United States to meet with U.S. taxpayers; and, in or about 2008 and 2009, assured U.S. taxpayer-clients that they did not have to be concerned about the undeclared accounts being discovered by the IRS or U.S. law enforcement authorities because unlike UBS AG, another Swiss bank that was being investigated at the time by U.S. authorities for engaging in similar practices, BJB no longer had offices in the United States and the accounts would therefore remain secret.

## Means and Methods of the Conspiracy

6.    Among the means and methods by which BJB, the defendant, and its co-conspirators carried out the conspiracy were the following:

a.    BJB client advisors opened and managed for U.S. taxpayer-clients bank and securities accounts at BJB that were not reported to the IRS on Forms 1040, FBARs, or otherwise, and the income from which was also not reported to the IRS.

b.    BJB client advisors permitted U.S. taxpayer-clients to open undeclared accounts using code names or numbers so that the U.S. taxpayers could sign their code names or numbers on bank documents, rather than use their usual signatures, and otherwise ensure that the U.S. taxpayer-clients' names would

appear on the fewest possible documents relating to their accounts.

        c.    BJB client advisors permitted U.S. taxpayer-clients to place assets in undeclared accounts held in the name of foreign relatives in order to conceal the U.S. taxpayer-clients' beneficial ownership of such assets.

        d.    BJB client advisors permitted U.S. taxpayer-clients to maintain undeclared accounts at BJB held in the name of sham corporate entities in order to conceal the U.S. taxpayer-clients' beneficial ownership of such assets.

        e.    BJB client advisors ensured that account statements and other records relating to undeclared accounts held at BJB by U.S. taxpayer-clients were not sent to these clients in the United States.

        f.    BJB client advisors caused U.S. taxpayer-clients with undeclared accounts at BJB to travel from the United States to Switzerland in order to discuss their undeclared accounts.

        g.    Certain BJB client advisors traveled to the Southern District of New York to review account information with U.S. taxpayer-clients with undeclared accounts at BJB.

        h.    Various U.S. taxpayer-clients of BJB, including taxpayer-clients in New York, New York, filed false Forms 1040 that failed to report their interest in, and income earned from, their

undeclared BJB accounts; evaded income taxes due and owing; and
failed to file FBARs identifying their undeclared accounts.

### Statutory Allegations

7.    From at least in or about 2001 up through and
including in or about 2009, in the Southern District of New York and
elsewhere, BJB, the defendant, together with others known and
unknown, willfully and knowingly did combine, conspire, confederate,
and agree together and with each other to defraud the United States
of America and an agency thereof, to wit, the IRS, and to commit
offenses against the United States, to wit, violations of Title 26,
United States Code, Sections 7206(1) and 7201.

8.    It was a part and an object of the conspiracy that
BJB, the defendant, together with others known and unknown, willfully
and knowingly would and did defraud the United States of America and
the IRS for the purpose of impeding, impairing, obstructing, and
defeating the lawful governmental functions of the IRS in the
ascertainment, computation, assessment, and collection of revenue,
to wit, federal income taxes.

9.    It was further a part and an object of the conspiracy
that various U.S. taxpayer-clients of BJB, the defendant, together
with others known and unknown, willfully and knowingly would and did
make and subscribe returns, statements, and other documents, which

6

contained and were verified by written declarations that they were
made under the penalties of perjury, and which these U.S.
taxpayer-clients, together with others known and unknown, did not
believe to be true and correct as to every material matter, in
violation of Title 26, United States Code, Section 7206(1).

10.   It was further a part and an object of the conspiracy
that BJB, the defendant, together with others known and unknown,
willfully and knowingly would and did attempt to evade and defeat
a substantial part of the income tax due and owing to the United States
of America by certain of BJB's U.S. taxpayer clients, in violation
of Title 26, United States Code, Section 7201.

### Overt Acts

11.   In furtherance of the conspiracy and to effect the
illegal objects thereof, BJB, the defendant, and others known and
unknown, including BJB client advisors acting within the scope of
their employment with BJB, committed the following overt acts, among
others, in the Southern District of New York and elsewhere:

a.   In or about 2006, Fabio Frazzetto
("Frazzetto"), a BJB client advisor and co-conspirator not named as
a defendant herein, opened new undeclared accounts for several U.S.
taxpayer clients at BJB.

b.   On or about March 30, 2006, the head of BJB's
North America Team, a group of BJB client advisors who assisted a

7

number of U.S. taxpayer-clients in maintaining undeclared accounts at BJB, sent an email to members of the North American Team regarding "Do's and Don'ts" when travelling to the United States to meet with U.S. clients.

c.   In or about 2007 or 2008, Frazzetto met with a U.S. taxpayer client at a hotel in Manhattan.

d.   In or about the summer of 2008, Daniela Casadei ("Casadei"), a BJB client advisor and co-conspirator not named as a defendant herein, assisted a U.S. taxpayer-client in transferring assets from an undeclared account at UBS AG into an undeclared account at BJB for the U.S. taxpayer-client under the name "Conto Green-White-House."

e.   In or about June 2009, Casadei advised a U.S. taxpayer client that the client could maintain an undeclared account at BJB if the client agreed to the formation of a corporate entity that would then become the account holder of the client's undeclared account at BJB.

8

f.    In or about August 2009, Frazzetto opened a new undeclared account in the name of an Israeli citizen and resident who was a cousin to a family of U.S. taxpayer clients.  Frazzetto then transferred the U.S. family's assets into the account nominally held by the Israeli cousin in order to further conceal the U.S. taxpayer-clients' financial interest in those funds.

(Title 18, United States Code, Section 371.)

*Preet Bharara*

PREET BHARARA
United States Attorney

# Exhibit C
# to the Deferred
# Prosecution Agreement

**Exhibit C to Deferred Prosecution Agreement with Bank Julius Baer & Co. Ltd.**

<u>**Statement of Facts**</u>

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Southern District of New York ("USAO") and Bank Julius Baer & Co. Ltd. ("Julius Baer"), a subsidiary of the Julius Baer Group. As used herein, and unless otherwise specified, "Julius Baer" refers collectively to Bank Julius Baer & Co. Ltd., its subsidiaries, and their predecessors in interest. The parties agree and stipulate that the following information is true and accurate:

**I.      Background**

Founded in the 1890s and headquartered in Zurich, Switzerland, Julius Baer is a corporation organized under the laws of Switzerland and licensed and regulated by the Swiss Financial Market Supervisory Authority ("FINMA") to provide banking and brokerage services. Prior to 1980, Julius Baer was a privately-held corporation. In that year, Julius Baer's then-parent company, Julius Baer Holding Ltd., issued shares on the Swiss stock exchange. In 2005, the Julius Baer Group became wholly public. Shares of the Julius Baer Group are listed on the Swiss stock exchange SIX under the symbol "BAER." Julius Baer has over 40 locations in 20 countries and has approximately 5,500 employees worldwide. As of December 31, 2014, Julius Baer had approximately CHF (Swiss francs) 290 billion in assets under management ("AUM"), which equates to approximately $288 billion.

In addition to accounts held by Swiss citizens and businesses, at all relevant times, Julius Baer provided private banking and asset management services to individuals and entities outside Switzerland, including citizens and residents of the United States ("U.S. taxpayers"). Julius Baer provided these services principally, though not exclusively, through private bankers based in Zurich. Julius Baer also acted as a custodian of assets that were managed by third-party investment advisors primarily based in Europe, including assets beneficially owned and controlled by U.S. taxpayers.

**II.     The Offense Conduct**

<u>Overview</u>

From at least in or about the 1990s through 2009, Julius Baer assisted certain U.S. taxpayers to evade their U.S. tax obligations, file false federal tax returns with the Internal Revenue Service (the "IRS"), and otherwise hide accounts held at Julius Baer from the IRS (hereinafter, "undeclared accounts"). Julius Baer did so by opening and maintaining undeclared accounts for U.S. taxpayers and by allowing third-party asset managers to open undeclared accounts for U.S. taxpayers at Julius Baer. In furtherance of a scheme to help U.S. taxpayers hide assets from the IRS and evade taxes, Julius Baer undertook, among other actions, the following:

- Julius Baer entered into "code word agreements" with U.S. taxpayer-clients under which the bank agreed not to identify the U.S. taxpayers by name within the bank or on bank

documents, but rather to identify the U.S. taxpayers by code name or number, in order to reduce the risk that U.S. tax authorities would learn the identities of the U.S. taxpayers.

- Julius Baer opened and maintained accounts for many U.S. taxpayer-clients held in the name of non-U.S. corporations, foundations, trusts, or other legal entities (collectively, "structures") or non-U.S. relatives, thereby helping such U.S. taxpayers conceal their beneficial ownership of the accounts.

- Julius Baer offered a variety of traditional Swiss banking services that it knew could assist, and that did assist, U.S. taxpayer-clients in the concealment of assets and income from the IRS.  For example, Julius Baer entered into agreements with clients by which it held bank statements and other mail relating to the accounts at Julius Baer's offices in Zurich, rather than send them to U.S. taxpayer-clients in the United States, to ensure that documents reflecting the existence of the accounts remained outside the United States and beyond the reach of U.S. tax authorities.

The Growth of Julius Baer's U.S. Business in the 2000s and
Internal Policies Relating to U.S. Business

As set forth in an internal policy established in 2001 entitled "U.S. Client Policy" (the "2001 Policy"), Julius Baer's general policy regarding U.S. domiciled taxpayer-client accounts was that these accounts had to be serviced from Julius Baer's New York branch office, which is discussed in more detail below.  The 2001 Policy also established that an existing U.S. taxpayer-client with an account established offshore with Julius Baer could maintain an account if (1) all account documentation was signed by the client outside the United States; (2) no communications other than account statements were sent to or through the United States; and (3) no meetings took place in the United States other than with employees of the New York branch or its representative offices.   Additionally, a new U.S. client could open an offshore account under the same conditions if the client also made the initial contact with Julius Baer.  The 2001 Policy focused on compliance with U.S. securities laws and did not require any verification of U.S. tax compliance by U.S. taxpayer-clients in regard to accounts maintained by Julius Baer.

Between in or about 2002 and in or about 2007, Julius Baer's U.S. client business grew as a result of a number of factors, including the opening of accounts for new U.S. clients and the acquisition in 2005 of three private Swiss banks from UBS AG ("UBS").  The acquisition of these three banks -- Banco di Lugano ("BDL"), Ehinger & Armand von Ernst ("EAvE") and Ferrier Lullin ("FL") -- added approximately over $1 billion in AUM relating to U.S. taxpayers. Julius Baer undertook specific efforts to retain a number of U.S. clients who held accounts at EAvE through a particular EAvE client advisor who chose not to remain at Julius Baer after it acquired EAvE.  These efforts included trips by senior management of Julius Baer to the United States in order to meet personally with the U.S. taxpayer-clients whom they sought to convince to stay with Julius Baer.

Client accounts were generally maintained by Julius Baer employees referred to herein as relationship managers.  These individuals served as the primary contact persons for Julius Baer's U.S. clients or their external asset managers.  Within Julius Baer, a North America Team existed within Julius Baer's private banking operation in Switzerland.  While U.S. taxpayer-client

2

accounts were also managed by Julius Baer relationship managers assigned to other teams, this team held primary responsibility for Julius Baer's U.S.-related private banking business.

Before in or about 2005, Julius Baer maintained branches in the United States, including in New York, New York, with representative offices in Los Angeles, San Francisco, and Palm Beach, Florida. Through these "onshore" operations, prospective U.S. taxpayer-clients were often introduced to "offshore" Julius Baer relationship managers who were based in Switzerland. Once offshore accounts were created for U.S. taxpayer-clients, some of the servicing of these offshore accounts was carried out through Julius Baer's onshore infrastructure in the United States. This servicing included facilitating access to funds in the United States, such as sending funds or credit cards tied to offshore accounts to Julius Baer offices in the United States for pickup by U.S. taxpayer-clients. Certain U.S. taxpayer-clients with offshore accounts at Julius Baer explicitly informed their Julius Baer relationship managers that none of their Julius Baer account records should be maintained at any Julius Baer offices in the United States in order to prevent the detection of these accounts by U.S. authorities. In or about 2005, Julius Baer sold its U.S. "onshore" business and no longer maintained any branches in the United States.

In 2006, Julius Baer implemented a new policy memorandum entitled "Private Banking U.S. Clients Policy" (the "2006 Policy"). The 2006 Policy generally stated that Julius Baer should not offer private banking services to U.S. domiciled taxpayer-clients, but that existing relationships could be maintained if (1) no communications were sent to or through the United States; (2) no meetings took place in the United States; and (3) all account documents were signed outside the United States. The 2006 Policy focused on compliance with U.S. securities laws and did not require any verification of U.S. tax compliance by U.S. taxpayer-clients in regard to accounts maintained by Julius Baer.

In 2008, Julius Baer issued a policy memorandum entitled "Offshore Client Policy" (the "2008 Policy"). The 2008 Policy generally mandated strict compliance with internal U.S. client policies, including the 2006 Policy.

Julius Baer's Qualified Intermediary Agreement and Efforts to Assist U.S. Taxpayers in
Avoiding Being Identified to the IRS Pursuant to Julius Baer's QI Obligations

In or about 2000, Julius Baer entered into a Qualified Intermediary Agreement ("QI") with the IRS which took effect in 2001. Under the QI, Julius Baer was generally obligated to identify and document any accounts that held U.S. source income, including for example U.S. securities, by collecting either an IRS Form W-9[1] for U.S. persons or IRS Form W-8BEN[2] or equivalent documentation for non-U.S. persons. Accordingly, as a matter of practice, U.S. taxpayer-clients were required to either submit Form W-9s or were precluded from holding U.S. securities in their accounts.

In an effort to avoid triggering Julius Baer's obligations under the QI to report to the IRS accounts held by U.S. taxpayer-clients who held U.S. securities in their undeclared accounts,

---

[1] The IRS Form W-9 is a tax form that identifies an individual as a U.S. taxpayer.
[2] The IRS Form W-8BEN is a tax form that identifies the foreign status of non-U.S. persons for U.S. tax withholding purposes.

Julius Baer allowed and facilitated U.S. clients with undeclared accounts at Julius Baer to open accounts nominally held by sham structures formed under the laws of other countries such as Liechtenstein and the British Virgin Islands. Part of this effort included Julius Baer referring certain U.S. taxpayer-clients to third-party service providers to establish these structures.

Julius Baer treated these non-U.S. sham structures as the account holders, and accordingly did not require the submission of Form W-9s for these accounts as Julius Baer was obligated to do under its QI obligations for accounts held by U.S. persons that held U.S. securities. Julius Baer took this position even when it had knowledge that the actual beneficial owner of the account was a U.S. taxpayer. For example, one relationship manager in September 2000 noted in an internal Julius Baer email in regard to the implementation of the QI (translated from German):

> Now, I have not yet heard from you and would be grateful if you could provide with input to this effect. I have umpteen American clients and, most notably, some US clients, who opened BVI companies . . . *to avoid the QI issue.* I travel home . . . and hear the wildest things regarding the QI issue. Nobody seems to have an overview of it at all yet. The problem is that today is 12 September and it will be 31 December pretty soon. We are slowly beginning to run out of time. *I must know sooner or later which (sure-fire) solutions I can offer my clients* (emphasis added).

Julius Baer relationship managers' knowledge that the accounts at issue were actually owned by U.S. taxpayers, as opposed to sham structures formed under the laws of other countries, was often demonstrated by a particular form in the account opening documents ("Form A") that was required to be maintained by Swiss banks and that set forth the true beneficial owners of the accounts in question. These Form As often identified U.S. taxpayers with addresses in the United States.

Relatedly, at least one Julius Baer relationship manager helped U.S. taxpayer-clients maintain undeclared accounts by helping those U.S. clients open and maintain accounts at Julius Baer that were nominally held by non-U.S. relatives when, in fact, the U.S. clients remained the beneficial owners of the assets in these accounts.

The number of undeclared accounts for U.S. taxpayer-clients at Julius Baer held in the name of structures constituted a substantial portion of the total undeclared accounts at Julius Baer for U.S. taxpayer-clients and continued to increase until Julius Baer implemented remedial measures, discussed in more detail below. In 2008, Julius Baer reached its high water mark in regard to the number of undeclared accounts for U.S. taxpayer-clients held by structures. In that year, 1,043 accounts were held by structures, representing approximately 36% of all undeclared accounts held by U.S. taxpayer-clients at Julius Baer.

As set forth in more detail below, Julius Baer was aware that it was a crime under U.S. law for U.S. taxpayers to evade paying taxes and for Julius Baer to assist them in doing so. Julius Baer understood the legal prohibitions regarding tax evasion to be distinct from Julius Baer's obligations under its QI. For example, a 2006 presentation, entitled "North America: Current Status and Future Strategy," presented by the head of the North America Team (the "North America Team Head") to Julius Baer senior management set out a list of regulatory

"issues" relating to U.S. clients. One of the issues referenced was the QI, stating that a non W-9 U.S. client cannot hold U.S. securities. The "Impact" of this issue was listed as "Med," or medium. Separate and apart from the "QI" issue, this 2006 presentation also included an item entitled "IRS." That line item stated: "It is a criminal offence to evade tax." The "Impact" of the IRS "issue" was listed as "High."

Julius Baer's Awareness of U.S. Taxpayer Obligations Under U.S. Law and Its Aiding and Abetting of U.S. Taxpayer-Clients In Evading U.S. Taxes

At all relevant times, Julius Baer knew that certain U.S. taxpayers-clients were maintaining undeclared accounts at Julius Baer in order to evade their U.S. tax obligations, in violation of U.S. law. Julius Baer knew this, in part, because significant numbers of U.S. taxpayers employed sham structures to hold their accounts, entered into code word agreements and hold mail agreements when they opened their accounts, and expressly relayed concerns to Julius Baer relationship managers regarding their accounts being detected by the IRS.

Julius Baer was aware that U.S. taxpayers had a legal duty to report to the IRS, and pay taxes on the basis of, all of their income, including income earned in accounts that these U.S. taxpayers maintained at Julius Baer. Despite being aware of this legal duty, Julius Baer intentionally opened and maintained undeclared accounts for these taxpayers with the knowledge that, by doing so, Julius Baer was helping these U.S. taxpayers violate their legal duties. Julius Baer was aware that this conduct violated U.S. law.

In internal Julius Baer correspondence, undeclared accounts held by U.S. taxpayers were at times referred to as "non W-9," "tax neutral," "unofficial," "black money," or "sensitive" accounts.

In February 2001, Julius Baer employees circulated a draft email that read:

> the Swiss banking secrecy issue for clients who deal outside of Switzerland has been addressed repeatedly. *[I]n order to provide as much protection to the client as possible*, we will be doing the following over the next couple of weeks:
>
>> identifying endangered (can we use a different word, say "sensitive status"?) accounts
>> changing global booking procedures, for instance in NY, if appropriate
>> getting signed client waivers, whenever possible without jeopardizing the account
>> ensuring the names of endangered accounts do not appear on any codelist outside of Switzerland
>
> now, what does it mean for you as relationship managers:
>
> please check on all your private clients if the account is declared to the clients' tax authorities or if it is tax neutral. if the relationship is an independent asset manager[], this becomes irrelevant, as long as only the IAM is calling or dealing outside of Switzerland.

5

> I need a list of your clients with undeclared accounts before February 28th. please use some discretion finding out this information-- don't for instance ask the client outright whether his account is taxed or not. in general, assume it is sensitive status if the mail stays in the bank [referencing mail hold agreement] or the account is in a Liechtenstein [structure]. a numbered account does not necessarily mean it is not taxed. so, please make this investigation[] . . . (emphasis added).

Certain U.S. taxpayer-clients expressly discussed with their Julius Baer relationship managers their fear of being detected by the IRS.  For example, in a handwritten note dated in 2004, while Julius Baer still maintained branches in the United States, a U.S. taxpayer-client sent a handwritten note to his Julius Baer relationship manager stating, in relevant part:

> Our relationship with [Julius Baer] has been tarnished!  We don't need exposure which could cause IRS investigation.  We'd like to have all our records and relationship with [Julius Baer] Florida office removed.  We would like to deal only with Zurich.  Is this possible?  (emphasis in original).

In another email, dated July 2006, a Julius Baer relationship manager noted to another Julius Baer employee that during a meeting with a U.S. taxpayer-client, this client, despite assurances to the contrary regarding a particular provision of Swiss secrecy law, "still fears that by this we will be able to give[] his name away to any American Authority whenever they would ask for it."

Julius Baer relationship managers also arranged cash withdrawals for U.S. taxpayers in ways that helped to avoid IRS detection of the clients' accounts at Julius Baer.  For example, in March 2004, a client requested that his or her Julius Baer relationship manager mail to a hotel at which the client would be staying checks in four different envelopes, with each envelope containing 14 different checks for a certain amount.  The client further directed that the Julius Baer relationship manager wait two days between the mailing of each envelope.  On another occasion in 2004, a Julius Baer relationship manager, as reflected in an email written to another Julius Baer employee, advised a U.S. taxpayer-client that "one way of bringing smaller amounts into the US on a discrete basis would be an ATM card that Switzerland issues, making no mention of names and banks and transaction would be through a 3rd party and not Julius Baer. She is interested to get some information on this."

Julius Baer relationship managers were generally aware that U.S. clients requested funds be sent in multiple checks as a means of evading U.S. reporting requirements.

Julius Baer relationship managers traveling to the United States were also advised to take certain steps to avoid scrutiny from U.S. authorities when travelling to the United States, as well as steps to avoid U.S. law enforcement identifying Julius Baer clients.  In a memo entitled "U.S. Clients Do's & Don'ts" sent on March 24, 2006, a member of the North America Team provided fellow relationship managers on the North America Team the following advice:

1.    At Immigration

    a.    When filling out the entry form or when asked by Officer about the object of your visit, say that you are in Banking (never lie) but if and when asked in which field, respond "EDP Dept." "Investment Banking" or "Lending", but certainly not Private Banking. (Market Research, Mergers & Acquisitions is always a good answer)

    b.    When asked by Officer what will you do while in the USA, say Business and of course some leisure, trying to take some time to enjoy your beautiful country. Proud government employees usually love this type of statement.  One can throw in skydiving or another fun sport/activity.  This tends to shift the questioning away from the business purpose to the "fun time" part of the trip (carrying a tennis racket also puts the emphasis on "fun and games", and not on business).

    c.    When waiting in the queue, avoid mentioning to other Bankers or people in the business that you go to USA.  If you do, focus on "vacation, leisure" rather than business. The same applies during the flight over.

    d.    When entering the USA, preferably dress casual.  As people fly normally on weekends, this shouldn't be too difficult

2.    Carry-on, baggage

    a.    Do not carry any Baer papers with you, no business or calling cards, no baer [sic] research material. This type of material should be sent prior to arrival to the Hotel or Baer office if possible.

    b.    Do not bring laptop, or other electronic devices which hold client data (absolutely nothing).  One travels more like in the old days (no cell phone with saved client phone numbers).

    c.    Clients' phone list must be faxed to Hotel upon arrival (use two lists, one with names only and one with phone/fax numbers).  Send / receive[] lists separately and anonymously (no Baer remarks on them)

3.    Data, other materials & communication

    a.    Portfolio valuations have to be faxed without header/logo to either a Baer office or to the Hotel or the client.  Fax portfolio valuation separately, not several at once. Wherever and whenever possible, do not have a portfolio valuation.  Get a portfolio breakdown and performance over the phone from an assistant in a phone call and discuss market generalities, rather than specific investments in a particular portfolio.  Of course, this is not always possible or practical as it depends greatly on the relationship one has with a given client.

b.      Only use Mobile phone registered in and operating from Switzerland.  Avoid phone calls from Hotel to clients.  It is recommended to purchase a telephone calling card from the post office, grocery stores or electronic shops.  This allows you to use practically any phone with no specific link left behind.  The best is to pay for the calling card in cash.  For ex: a 400 minutes local calling card costs less than $50, but the rates can vary.  Most cards can also be used to call anywhere abroad.

Certain U.S. taxpayer-clients of Julius Baer used the U.S. mails, private or commercial interstate carriers, or interstate wire communications to submit individual federal income tax returns to the IRS that were materially false and fraudulent in that these returns failed to disclose the existence of such taxpayers' undeclared accounts or the income earned in such accounts.

<u>Julius Baer's Initial Receipt of U.S. Business Migrating From UBS</u>

In or around November 2007, Julius Baer came to learn that UBS was closing its U.S. offshore business.  In an email dated December 11, 2007, the North America Team Head described UBS's closing of its U.S. offshore business as "[a] big opportunity for us hopefully!"  In or around January 2008, Julius Baer began opening accounts for U.S. taxpayer-clients who formerly maintained accounts at UBS.  In or around February 2008, Julius Baer came to understand that a number of UBS relationship managers were under investigation by the United States Department of Justice in regard to their managing offshore accounts for U.S. clients.  As a result, Julius Baer ceased efforts to recruit relationship managers from UBS who focused on U.S. offshore accounts.  The North America Team Head wrote in an email to senior management on February 18, 2008, in regard to the U.S. investigation that: "The latest developments make it less attractive to expand the US team at this time, particularly since the UBS candidates, even if eventually cleared, could potentially put our activities with US clients on the radar screen by association."  The email continued: "We propose, therefore, to continue to focus on moving the UBS clients rather than the [relationship managers] through business introducer and fiduciary contact stressing that we are still very much 'open for business' in the offshore US market."

In regard to U.S. accounts from UBS, in approximately the first half of 2008 Julius Baer ultimately opened approximately 247 non W-9 accounts for U.S. taxpayer-clients who formerly held accounts at UBS.  In total these accounts brought approximately CHF 609 million in new AUM for Julius Baer.  These clients generally came to Julius Baer via third-party referrals and as accounts managed by third-party asset managers.

In regard to U.S. taxpayer-clients who already maintained undeclared accounts at Julius Baer when the investigation into UBS became public, certain Julius Baer relationship managers assured clients who expressed concern about the UBS investigation that because Julius Baer no longer had a presence in the United States, it was therefore different from UBS and not susceptible to U.S. law enforcement issues that UBS was facing.

<u>Julius Baer's Reaction to the UBS Investigation</u>

In or about May 2008, UBS publicly confirmed an inquiry being conducted by U.S. authorities.  The following month, in June 2008, Julius Baer created a Business Practice Review Committee ("BPRC") to perform an initial review of cross-border banking

8

relationships with clients from the United States and other markets.  In July 2008, Julius Baer issued a policy prohibiting the opening of non W-9 accounts from UBS for U.S. taxpayers. Exceptions to this policy were permitted up through October 2008 for accounts managed by certain external asset managers based on various factors, including the value of the account.

Julius Baer Begins Its Exit From U.S. Business

In addition to the BPRC formed in June 2008, in August 2008, Julius Baer established a U.S. Account Review Committee to conduct a further internal review of its U.S. client business. In October 2008, Julius Baer began to implement a policy prohibiting the opening of new structures with a U.S. beneficial owner without a Form W-9 or U.S. tax opinion from a reputable law firm.

In November 2008, Julius Baer created an International Clients Steering Committee to continue the work for the U.S. Account Review Committee and to develop policies and procedures going forward.  By November 2008, the Bank began an "exit" plan for U.S. client accounts that lacked evidence of U.S. tax compliance.  In that same month, Julius Baer imposed a prohibition on opening accounts for any U.S. clients without a Form W-9.

By June 2009, Julius Baer initiated termination of accounts held by sham structures with U.S. beneficial owners.  In November 2009, the Board of Directors of Julius Baer instituted a Special Committee comprised of three independent directors to oversee an additional, more complete assessment of the U.S. client business.  By December 2009, Julius Baer initiated the mandatory closure of non W-9 accounts held by U.S. persons and the forced liquidation of U.S. taxpayer-client accounts that failed to provide evidence of tax compliance.   During this exit process, Julius Baer also sent numerous letters to U.S. account holders encouraging them to participate in the IRS's Offshore Voluntary Disclosure Program.

Julius Baer's Blocked Effort to Self-Report to U.S. Authorities in November 2009

In February 2009, the United States Department of Justice and UBS entered into a deferred prosecution agreement relating to UBS's having assisted various U.S. taxpayers to violate their tax obligations under U.S. law.  In regard to Julius Baer, as evidenced by the minutes of the Board of Directors meeting that took place on November 4, 2009, and before it became aware of any U.S. investigation into its conduct, Julius Baer decided to approach proactively U.S. law enforcement authorities regarding Julius Baer's having maintained undeclared accounts for U.S. taxpayers.  Prior to self-reporting to the United States Department of Justice, Julius Baer notified its regulator in Switzerland of its intention to contact U.S. law enforcement authorities.  This Swiss regulator requested that Julius Baer not contact U.S. authorities in order not to prejudice the Swiss government in any bilateral negotiations with the U.S. government on tax-related matters.  Accordingly, Julius Baer did not at the time self-report to U.S. law enforcement authorities.

Julius Baer Continues Its Exit From U.S. Business

By the end of 2010, Julius Baer had largely completed its exit of U.S. accounts for which the beneficial owners had failed to provide evidence of tax compliance.  In 2012 Julius Baer

retained a major external auditor to ensure that the bank had successfully implemented its exit polices in regard to undeclared U.S. taxpayer-client accounts

The Impact of Undeclared Accounts on Julius Baer's AUM, Fees, and Profit

Julius Baer's conduct allowed it to increase the undeclared U.S. taxpayer assets that it held, thereby increasing its fees and profits. As shown in the table below, Julius Baer increased the AUM that it held for undeclared U.S. taxpayers from approximately $984 million in 2001 to approximately $4.7 billion in 2007, its peak year in regard to undeclared AUM. That year, Julius Baer had approximately 2,589 undeclared U.S. taxpayer-clients, including those who held accounts through structures. From 2001 through 2011, Julius Baer earned approximately $87 million in profit on approximately $219 million gross revenues from its undeclared U.S. taxpayer accounts, including accounts held through structures.

The following table shows the approximate number of U.S. taxpayer-clients who held undeclared accounts at Julius Baer from 2001 through 2011, including accounts held through structures; the approximate total AUM for such undeclared accounts; and total gross fees earned by Julius Baer from undeclared accounts held by U.S. persons.

| Date | Total Undeclared Accounts Held by Julius Baer for U.S. Persons | Total Undeclared AUM Held for U.S. Persons (in millions of U.S. dollars) | Total Revenue in Fees from Undeclared Accounts Held by Julius Baer for U.S. Persons (in millions of U.S. dollars) |
|---|---|---|---|
| 12/31/2001 | 816 | $984.41 | $8.04 |
| 12/31/2002 | 1,004 | $1,074.17 | $8.77 |
| 12/31/2003 | 1,563 | $1,709.01 | $13.94 |
| 12/31/2004 | 1,592 | $2,207.04 | $18.11 |
| 12/31/2005 | 1,509 | $2,440.17 | $15.64 |
| 12/31/2006 | 2,336 | $3,758.50 | $30.84 |
| 12/31/2007 | 2,589 | $4,728.09 | $41.18 |
| 12/31/2008 | 2,864 | $4,206.27 | $43.52 |
| 12/31/2009 | 1,401 | $1,604.54 | $25.74 |
| 12/31/2010 | 568 | $685.57 | $8.23 |
| 12/31/2011 | 270 | $140.61 | $5.24 |
| **Total** | | | **$219.25** |

Julius Baer admits that the U.S. taxpayers it assisted in this manner evaded approximately $247 million in U.S. taxes that remain unpaid as of the date of this Statement of Facts.

# Exhibit D
# to the Deferred
# Prosecution Agreement

PREET BHARARA
United States Attorney for the
Southern District of New York
By:   JASON H. COWLEY
      SARAH E. PAUL

Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                :

                Plaintiff,       :       VERIFIED COMPLAINT

        -v.-                          :       16 Civ. ____

$219,250,000 in United States       :
Currency,

                            :
              Defendant *in rem.*
- - - - - - - - - - - - - - - - - -x

Plaintiff United States of America, by its attorney, PREET
BHARARA, United States Attorney for the Southern District of New
York, for its Verified Complaint (the "Complaint") alleges, upon
information and belief, as follows:

## I.   JURISDICTION AND VENUE

1.   This action is brought by the United States of
America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the
forfeiture of $219,250,000 in United States Currency (the
"Defendant Funds").

2.   This Court has jurisdiction pursuant to 28 U.S.C.
§§ 1345 and 1355.

3.    Venue is proper pursuant to 28 U.S.C. §
1355(b)(1)(A) because acts and omissions giving rise to the
forfeiture took place in the Southern District of New York.

## II.   NATURE OF THE ACTION

4.    As alleged in *United States* v. *Bank Julius Baer &
Co. Ltd.*, S3 11 Cr. 866 (LTS) (the "Julius Baer Information,"
attached as Exhibit A and incorporated by reference herein),
from at least in or about 2001 up through and including at least
in or about 2009, Bank Julius Baer & Co. ("Julius Baer"), a
Swiss bank, conspired with others known and unknown to defraud
the United States of certain taxes due and owing by concealing
from the United States Internal Revenue Service ("IRS")
undeclared accounts owned by U.S. taxpayers at Julius Baer.

5.    On or about February 2, 2016, the United States
Attorney's Office for the Southern District of New York (the
"Office") and Julius Baer entered into a deferred prosecution
agreement (the "Julius Baer DPA," attached as Exhibit B and
incorporated by reference herein).

6.    Pursuant to the Julius Baer DPA, Julius Baer
agreed to transfer $219,250,000 in United States Currency (the
Defendant Funds) to the United States Treasury.  The Defendant
Funds represent Julius Baer's gross proceeds from its scheme to

defraud the United States as set forth in the Julius Baer
Information.

### III. CLAIM FOR FORFEITURE

7.    The allegations contained in paragraphs one
through six of this Verified Complaint are incorporated by
reference herein.

8.    Title 18, United States Code, Section
981(a)(1)(C) subjects to forfeiture "[a]ny property, real or
personal, which constitutes or is derived from proceeds
traceable to a violation of . . . any offense constituting
"specified unlawful activity" (as defined in section 1956(c)(7)
of this title), or a conspiracy to commit such offense."

9.    "Specified unlawful activity" is defined in 18
U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C. §
1961(1).  Section 1961(1) lists as offenses both mail fraud (18
U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

3

10.   By reason of the above, the Defendant Funds are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

Dated:      New York, New York
            February ___, 2016

                           PREET BHARARA
                           United States Attorney for
                           Plaintiff United States of America

            By:            _____
                           JASON H. COWLEY
                           SARAH E. PAUL
                           Assistant United States Attorneys
                           One St. Andrew's Plaza
                           New York, New York 10007
                           (212) 637-2200

4

VERIFICATION

STATE OF NEW YORK                )
COUNTY OF NEW YORK               :
SOUTHERN DISTRICT OF NEW YORK )

ERIC JONKE, being duly sworn, deposes and says that he is a Special Agent with the Internal Revenue Service, Criminal Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the same is true to the best of his knowledge, information and belief.

The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

_____
Eric Jonke
Special Agent
Internal Revenue Service,
Criminal Investigation

Sworn to before me this
2th day of February, 2016

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2018_